UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| DOUG MURPHY, | ) | CIV. 07-5080-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER DENYING |
| vs. | ) | DEFENDANT'S MOTION |
| | ) | FOR SUMMARY JUDGMENT |
| KMART CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

This matter is before the court pursuant to defendant's motion for summary judgment. (Docket 180). Plaintiff resists defendant's motion in its entirety. (Docket 194). This matter has been fully briefed and is ripe for adjudication.

**UNDISPUTED MATERIAL FACTS**

The following recitation consists of material facts undisputed by the parties. These facts are contained in defendant's statement of undisputed material facts (Docket 182), as admitted to in plaintiff's response (Docket 197).

Plaintiff Doug Murphy began working for Kmart Corporation ("Kmart") in 1975 as an assistant management trainee. Mr. Murphy worked in a variety of positions at different store locations, but spent the last ten years of his employment as the store manager of the Rapid City Kmart in Rapid City, South Dakota. The Rapid City store is within Kmart's District 914.

Kmart distributes copies of its Associate Handbook ("handbook") and Code of Conduct ("code") to its employees.  Mr. Murphy periodically received copies of the handbook and code, and he knew copies of the handbook were available in each store.  The handbook sets forth Kmart's longstanding policy of providing a workplace free from all forms of unlawful discrimination and harassment.  The code also expresses Kmart's commitment to a discrimination-free workplace.  Both publications describe a reporting procedure for employees who suspect a violation of these anti-discrimination policies.[1] Employees should report any suspected violation to their store manager, their district manager, the office of compliance, or a toll-free ethics and compliance helpline.  Mr. Murphy received training on and was fully aware of these anti-discrimination policies and reporting procedures.

Mr. Murphy's responsibilities as a store manager included the following: adhering to and enforcing anti-discrimination policies; implementing corporate merchandising programs and directives; emphasizing customer care standards; maintaining the appearance of the store; and keeping the store well merchandised and stocked.

Mr. Murphy received "marginal," "below expectations," "needs improvement," or "unsatisfactory" ratings in at least one category of his performance reviews for the years 1987 through 1993, 1996, 1999, and 2003. For example, Mr. Murphy's performance review for the 2003 fiscal year,

---

[1]Mr. Murphy denies that employees were required to take advantage of Kmart's reporting procedure before bringing an age discrimination claim.

2

prepared in early 2004, contained an "unsatisfactory" rating in the category "Drive for Results," a rating based on an 11.5 percent decrease in sales in the Rapid City Kmart for the 2003 fiscal year.[2]

In June 2004, at age 49, Jerry Rudrude became the district manager for District 914.  Mr. Rudrude thus became Mr. Murphy's direct supervisor.  Later in 2004, Jesse Gonzalez became the regional manager for the region encompassing District 914.  Mr. Gonzalez was Mr. Rudrude's direct supervisor.

Mr. Rudrude visited the Rapid City Kmart six times between June 2004 and August 2005, observing and providing feedback on areas in need of improvement.  Mr. Rudrude noted similar issues during each visit.[3]  On July 2, 2004, and September 1, 2004, Mr. Rudrude noted areas for improvement.[4]  On October 7, 2004, Mr. Rudrude noted the store needed improvement in the

---

[2]The parties dispute who prepared Mr. Murphy's performance review for the 2003 fiscal year.  Kmart alleges Jerry Northern, the former district manager, conducted the review.  Mr. Murphy alleges the following: the review lists Jerry Rudrude as the reviewing manager; Mr. Murphy discussed the review with Mr. Rudrude; Mr. Rudrude admitted he prepared the review; and Mr. Northern testified he did not perform the review.  Kmart argues Mr. Rudrude's name appears on the review solely because he was Mr. Murphy's manager when the review was downloaded onto a disc in pdf format.  Kmart asserts the technical interface between its performance review and personnel data management systems caused personnel data to be uploaded into the performance review system even after the review was drafted.

[3]Mr. Murphy denies that the issues noted by Mr. Rudrude implied the Rapid City Kmart was failing or performing poorly.

[4]Kmart alleges Mr. Rudrude noted issues with store presentation, customer service, merchandising, cleanliness and maintenance of outside areas, clutter, and pest control.  Mr. Murphy admits Mr. Rudrude made notes for improvement, but denies the specific mention of certain issues.

3

following areas: painting and maintenance of the front end, counters and dressing rooms; repair of store fixtures; and merchandise organization.  In January of 2005, Mr. Rudrude noted the outside curbs were in disrepair and rated the store a "C-."  On February 2, 2005, Mr. Rudrude noted issues with lengthy checkout lines, incomplete store layouts, and inadequate staffing.[5]  In April 2005, Mr. Rudrude noted issues with merchandise presentation and store cleanliness.  Mr. Murphy received feedback following each store visit and attempted to correct the noted issues.

In early 2005, Mr. Rudrude evaluated Mr. Murphy's performance for the 2004 fiscal year.  He provided Mr. Murphy with additional suggestions for improvement, but rated Mr. Murphy as "Effective" or "Very Effective" in individual categories and "Effective" overall.  In April 2005, Mr. Rudrude noted issues with merchandise presentation and store cleanliness.  Mr. Rudrude provided feedback to Mr. Murphy following each visit, and Mr. Murphy attempted to correct the noted issues.

From June to mid-July of 2005, Mr. Rudrude did not visit stores or regularly report to his office due to complications following a medical procedure.  Instead, Bob Cline, the loss prevention manager for District 914, visited the stores and communicated his observations to Mr. Rudrude by, in part, sending photographs.

---

[5]Mr. Murphy alleges Mr. Rudrude, during this visit, rated the store an overall "C," which Mr. Rudrude considered a "pretty good rating."

On August 2, 2005, Mr. Rudrude and Mr. Gonzalez visited the Rapid City Kmart.[6]  This visit was unannounced.  Mr. Rudrude and Mr. Gonzalez noted issues with the following: burned out lights; a dirty service desk, sidewalks, and fixtures; a messy jewelry area; dirty seasonal items strewn about the outside of the store; insufficient number of promotional items and signage; improper stocking; disheveled end caps, layouts, and other merchandising displays and promotions; excessive staffing; and poor customer service by store associates who failed to greet customers and who wore dirty vests without proper name tags.[7]  Mr. Rudrude and Mr. Gonzalez rated the store an "F."[8]

---

[6]Kmart claims the purpose of this visit was to assess the store's appearance, merchandising, and customer service.  Kmart further claims Mr. Rudrude and Mr. Gonzalez did not announce their visit because they wanted to observe the store from the customer's perspective, without artificial preparation.  Mr. Murphy is skeptical of these "claimed justification[s]."  Kmart also claims Mr. Gonzalez recorded his observations electronically as he toured the store and his list spanned five single-spaced pages.  Mr. Murphy denies this claim.

[7]Mr. Murphy denies these issues were legitimate concerns or the issues noted were as serious as Kmart claims.  Mr. Murphy indicates "the majority of the store looked good that day."  Kmart alleges Mr. Murphy admitted the store "did not look as good," had "rougher looking areas," and was embarrassed by its condition.  Mr. Murphy denies this allegation.

[8]Mr. Murphy denies the "F" rating resulted from the store visit.  Kmart alleges Mr. Murphy and his staff spent the day correcting the issues noted and Mr. Murphy disciplined his assistant manager for leaving the store in such poor condition.  Mr. Murphy alleges most of the problems were small, requiring minimal time to correct, and, although he had "written up" the assistant manager for failing to clean the stationery and toy sections, "the majority of the store looked pretty good that day."  Mr. Murphy denies the entire store was in as poor a condition as Kmart claims.  Kmart also alleges Mr. Murphy verbally warned the assistant manager of merchandising for failing to properly manage the merchandising process.  Mr. Murphy denies this allegation, claiming he and the assistant manager of merchandising merely toured the store to discuss areas of improvement.

Mr. Rudrude placed Mr. Murphy on a Developmental Plan of Action ("DPA").[9]  On August 8, 2005, Mr. Rudrude and Mr. Murphy met to discuss the DPA.  Mr. Rudrude explained the goal of the DPA was to correct and improve Mr. Murphy's performance.  The DPA highlighted specific performance concerns and set forth steps for improvement.[10]  Mr. Murphy understood his performance would be reevaluated periodically.[11]

---

[9]Kmart asserts Mr. Rudrude placed Mr. Murphy on the DPA because of the concerns noted during the August 2, 2005, store visit and persistent performance issues with merchandising, store maintenance, and cleanliness.  Mr. Murphy denies he had any persistent performance problems.  Further, Kmart alleges Mr. Rudrude drafted the DPA after the August 2, 2005, visit.  Mr. Murphy denies this claim, arguing the document is dated March 2005.

[10]Kmart alleges Mr. Murphy was not placed on the DPA because of poor sales results, but rather for failing to meet other performance standards required of a store manager.  Mr. Murphy denies the validity of Kmart's claim.

[11]The parties disagree as to the outcome of the DPA.  Kmart alleges the DPA is a coaching tool designed to improve the employee's performance.  Kmart also alleges the purpose of the DPA is not to terminate the employee, although termination may occur if the employee does not improve while on the DPA.  Mr. Murphy disagrees, pointing to testimony that an employee is placed on a DPA when he is to be terminated and that the purpose of the DPA is to make the employee's life difficult so he leaves the company.

Kmart admits that, under appropriate circumstances, transfers and demotions may be available to store managers who are on a DPA.  However, Kmart asserts the practice in the Western Region did not permit the demotion or transfer of long-term store managers who failed to meet expectations while on DPAs.  Mr. Murphy alleges other store managers were demoted or laterally transferred while on DPAs.  Kmart asserts these store managers were not on DPAs at the time of their position change.  Mr. Murphy denies this claim.  Further, Mr. Murphy points to testimony that Divisional Vice President Rick Carr directed a district manager to place two store managers on DPAs "as a means of encouraging them to leave their employment."  Mr. Murphy asserts both store managers were demoted to assistant store managers.

On October 7, 2005, after at least two additional store visits, Mr. Rudrude and Mr. Murphy met to review Mr. Murphy's progress on the DPA.  Mr. Rudrude noted Mr. Murphy's performance had not significantly improved and many issues had not been resolved, including problems with merchandise assortment and replenishment, store appearance (maintenance and cleanliness), and customer service.[12]  On September 22, 2005, Mr. Rudrude drafted a Notice of Corrective Action, another disciplinary measure, for what he perceived to be "out of control" checkout lines.

In mid-October 2005, Clark Fox, an internal auditor for Kmart, conducted a routine audit[13] of the Rapid City Kmart and reported two "critical" irregularities: (1) on October 6, 2005, Mr. Murphy took a $300 unauthorized cash advance from the store; and (2) the improper accounting of over $3,200 of merchandise in use at the store.  Mr. Murphy did not request approval or obtain authorization for the cash advance.[14]  With respect to the second issue,

---

[12]Mr. Murphy claims that "most everything was fine with his store, but there were a few problems."

[13]Kmart claims its audit management team in consultation with an outside auditing firm initiated the audit, not Mr. Rudrude, Mr. Gonzalez, or Mr. Carr.

[14]The parties disagree as to whether authorization was required.  Kmart alleges cash advances are prohibited unless authorized in advance.  Kmart asserts, just days before Mr. Murphy took the cash advance, Mr. Rudrude and his assistant sent two e-mails to all store managers in the district explaining that cash advances had to be authorized in advance and instructing that no cash advances would be permitted for the October 2005 district meeting.  Mr. Murphy admits there was testimony on Kmart's policy, but denies he was required to obtain approval as it was Kmart's *practice* not to require approval.  Mr. Murphy points to testimony of Mr. Northern that it was normal and not inappropriate for store managers to obtain cash advances for meetings and then later pay back the cash advance.

Kmart's policy required that all inventory in use at a store be entered as such in the computer system, where it was charged against profits and no longer reflected as inventory on hand.  Mr. Murphy did not follow this procedure, instead tracking store use merchandise on paper without entering it into the computer, thereby overstating the store's saleable inventory.[15]  As part of Kmart's investigation into these matters, Mr. Rudrude sent Mr. Murphy several questions on October 21, 2005.  Mr. Murphy refused to respond to the questions or cooperate in the investigation, responding he was in a "no win situation" and would "plead the fifth."  Mr. Rudrude responded he must investigate audit irregularities and "pleading the fifth" was not an option.  Mr. Murphy still refused to cooperate.  Mr. Murphy subsequently admitted to the conduct underlying the two issues noted in the audit.[16]

On October 29, 2005, Mr. Murphy sent an e-mail quitting his job at Kmart, stating he wished "to pursue other opportunities."  Mr. Murphy was 52

---

[15]Mr. Murphy denies it was irregular to itemize the inventory as he did. He claims to have recorded inventory in this manner for many years.  He claims other district managers, including Mr. Rudrude, were aware of Mr. Murphy's inventorying method, yet never advised him it was improper. Mr. Murphy points to testimony of Mr. Northern that when Mr. Northern was the loss prevention district manager, he did not expense items immediately, but rather inventoried merchandise like Mr. Murphy.  Mr. Murphy claims Mr. Northern was aware of how Mr. Murphy was inventorying his store use merchandise.  Mr. Murphy points to testimony of Mr. Fox, the auditor, that Mr. Fox was aware of other stores submitting store use inventory like the Rapid City Kmart.

[16]Although he admitted to said conduct, Mr. Murphy argues (1) he was not required to obtain advance authorization for the cash advance and (2) his method of inventorying was not irregular.

years old when his employment with Kmart ended.[17]  Chuck Schwab became the new Rapid City Kmart store manager.  Mr. Schwab was 54 years old at the time and was a longer-term employee than Mr. Murphy with a higher salary. Mr. Schwab has been with Kmart for 36 years and is still the store manager for the Rapid City Kmart.

Mr. Murphy alleges that, at one or more district manager meetings, Mr. Carr[18] commented that Kmart needed to "get rid of the old managers," "get rid of the old guys," and "get new younger, more aggressive managers." Mr. Murphy claims to have heard Mr. Carr state at a manager's meeting in 2003 or 2004 that "we need to get younger people into this company, more younger people into this company."  Mr. Murphy did not report the comment. Mr. Rudrude claims to not have heard Mr. Carr make inappropriate age-related comments.[19]  Mr. Murphy never heard Mr. Rudrude make any age-related comment.

---

[17]Kmart alleges Mr. Murphy voluntarily quit his job.  Mr. Murphy alleges he was constructively discharged.

[18]Kmart alleges Mr. Carr played no role in Mr. Rudrude's management of Mr. Murphy, including the decision to place Mr. Murphy on a DPA. Mr. Murphy denies this allegation, arguing every employee is supposed to follow the orders of the Divisional Vice President.

[19]Mr. Murphy challenges the plausibility of this claim.  Mr. Rudrude was present at the San Diego meeting in April of 2004 when Mr. Carr made age-related comments, but he claims he did not hear Mr. Carr because he was sitting in the back of the room looking out the windows at traffic.

Mr. Murphy did not report any discriminatory conduct on the part of his supervisors.[20]  In May of 2006, Mr. Murphy filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging age discrimination on the part of Kmart.  On August 9, 2007, the EEOC dismissed Mr. Murphy's charge, finding insufficient evidence to conclude a statutory violation had occurred.

On November 5, 2007, Mr. Murphy filed a complaint alleging one count of age discrimination, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and one count of intentional infliction of emotional distress, a state law claim.  (Docket 1).  Kmart denied Mr. Murphy's claims and asserted various affirmative and other defenses.  (Docket 8).  On February 20, 2009, Mr. Murphy amended his complaint to add the additional state law claims of deceit and fraud.  (Docket 155).  Kmart denied Mr. Murphy's claims in their entirety and again asserted various affirmative and other defenses.  (Docket 158).  On July 17, 2009, Kmart filed the instant motion for summary judgment on all four counts of the amended complaint.  (Docket 180).  Mr. Murphy resists summary judgment.  (Docket 194).

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a), a movant is entitled to summary judgment if the movant can "show that there is no genuine issue as to any material fact

---

[20]Kmart alleges Mr. Murphy was required, pursuant to Kmart's anti-discrimination policies, to report any incident of discrimination.  Mr. Murphy denies that reporting was required, relying on testimony that it was not mandatory for an employee who suspected he was being discriminated against to call Kmart's Integrity hotline.

10

and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  Once the moving party has met its burden, the nonmoving party may

not rest on the allegations or denials in the pleadings, but rather must produce

affirmative evidence setting forth specific facts showing that a genuine issue of

material fact exists.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

Only disputes over facts that might affect the outcome of the case under the

governing substantive law will properly preclude summary judgment.  Id. at

248.  Accordingly, "the mere existence of *some* alleged factual dispute between

the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no *genuine* issue of *material* fact."

Id. at 247-48 (emphasis in original).

If a dispute about a material fact is genuine, that is, if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party,

then summary judgment is not appropriate.  Id.  However, the moving party is

entitled to judgment as a matter of law if the nonmoving party has failed to

"make a sufficient showing on an essential element of her case with respect to

which she has the burden of proof."  Celotex Corp. v. Catrett, 477 U.S. 317,

323 (1986).  In such a case, "there can be 'no genuine issue as to any material

fact,' since a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial."  Id.

In determining whether summary judgment should issue, the facts and

inferences from those facts must be viewed in the light most favorable to the

nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S.

574, 587-88 (1986).  The key inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law."  <u>Anderson</u>, 477 U.S. at 251-522.

**DISCUSSION**

**A.**     **Whether Summary Judgment is Appropriate on Mr. Murphy's Age Discrimination Claim**

The ADEA prohibits employers from taking adverse employment actions against employees because of their age.  <u>King v. United States</u>, 553 F.3d 1156, 1160 (8th Cir. 2009).  A plaintiff may establish a claim of intentional age discrimination through either direct or indirect evidence.  <u>Id.</u>  Where plaintiff presents direct evidence of discrimination, the court evaluates the claim under the mixed-motives framework established in <u>Price Waterhouse v. Hopkins</u>.[21] <u>Id.</u>  Where plaintiff presents indirect evidence of discrimination, the court evaluates the claim under the burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>.[22]  <u>Id.</u>

Under the <u>McDonnell Douglas</u> framework, a plaintiff may establish a prima facie case of age discrimination by showing (1) he is over the age of forty; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) similarly-situated employees outside the class were treated more favorably.  <u>Anderson v. Durham D & M, L.L.C.</u>, 606 F.3d 513, 523 (8th Cir.

---

[21]490 U.S. 228, 278-79 (1989).

[22]411 U.S. 792 (1973).

2010).  In discriminatory discharge cases, plaintiff may establish the fourth element by demonstrating he was replaced by a substantially younger individual.  Id.  Once plaintiff establishes a prima facie case of age discrimination, the burden of production shifts to the employer to demonstrate a legitimate, non-discriminatory reason for its employment action.  King, 553 F.3d at 1162.  Plaintiff then bears the burden of demonstrating the employer's stated reason was a mere pretext for discrimination.  Id.

In this case, the first two elements of a prima facie case are met. Mr. Murphy was over the age of forty when the acts giving rise to the cause of action allegedly occurred.  Further, Kmart has not challenged Mr. Murphy's qualifications to be store manager.  Rather, Kmart asserts Mr. Murphy's prima facie case fails because (1) he was replaced by an older individual, Mr. Schwab, and (2) he did not suffer an adverse employment action in that he voluntarily resigned his position.  (Docket 181 at p. 10).

Mr. Murphy argues he was replaced *in effect* by a younger employee. (Docket 194 at pp. 34-36).  Mr. Schwab was the store manager for the Spearfish Kmart before being transferred to the Rapid City Kmart to replace Mr. Murphy.  Once Mr. Schwab became the store manager of the Rapid City Kmart, Sean McCarthy was promoted to the position of store manager of the Spearfish Kmart.  However, Mr. Murphy asserts Mr. McCarthy was next in line to become store manager and should have become the manager of the Rapid City Kmart.  Mr. McCarthy was twenty-three years old at the time of his

promotion and his starting salary was $60,500–$19,000 less than

Mr. Murphy's salary.

Although the Court of Appeals for the Eighth Circuit has held a plaintiff

may establish a prima facie case by showing replacement by a younger person,

see Anderson, 606 F.3d at 523, it also has "adhered to the rule that the

elements of a prima facie case vary with the circumstances of the alleged

discrimination." Parrish v. Immanuel Medical Center, 92 F.3d 727, 733 n. 2

(8th Cir. 1996).  The Supreme Court "reaffirmed this principle . . . when it held

that a prima facie case requires only that a plaintiff produce evidence adequate

to create an inference that an employment decision was based on a[n] illegal

discriminatory criterion."  Id. (internal quotations omitted) (quoting O'Connor v.

Consolidated Coin Caterers Corp., 517 U.S. 308 (1996)).

The fact that Mr. Schwab became the new store manager of the Rapid

City Kmart is not an absolute bar to establishing a prima facie case of age

discrimination.  See Morgan v. A.G. Edwards & Sons, Inc., 486 F.3d 1034,

1044 (8th Cir. 2007) (acknowledging some courts have allowed plaintiffs to

establish prima facie cases of age discrimination where the replacement

employees were older, noting those courts "typically have required the plaintiff

to put forth additional evidence supporting the notion the older replacement

worker was a mere subterfuge to protect the employer from liability under the

ADEA").  The question of whether the replacement of Mr. Murphy by

Mr. Schwab was a subterfuge to protect Kmart from liability is for the jury to

decide.  Genuine issues of material fact exist as to (1) why Mr. Schwab was

transferred laterally to the Rapid City Kmart and (2) why Mr. McCarthy was promoted to store manager of the Spearfish Kmart instead of the Rapid City Kmart.  Mr. Murphy asserts at least ten former Kmart managers or district managers have filed age discrimination lawsuits against Kmart or Sears Holding Corporation since 2005.  (Docket 194 at p. 16).  If an employer may avoid liability by merely reshuffling its employees, the protections afforded by the ADEA would be nothing more than dust in the wind.

Genuine issues of material fact also exist as to whether Kmart constructively discharged Mr. Murphy.  To establish constructive discharge, Mr. Murphy must show (1) a reasonable person would have found his working conditions intolerable and (2) Kmart, through Mr. Rudrude, intended to make him resign or, at a minimum, his resignation was reasonably foreseeable given the conditions under which he was working.  Betz v. Chertoff, 578 F.3d 929, 936 (8th Cir. 2009).  "The intolerability of working conditions is judged by an objective standard and to prevail on a constructive discharge claim, a plaintiff must show that his or her working conditions were rendered so objectionable that a reasonable person would have deemed resignation the only plausible alternative."  Id. (internal quotation marks omitted).  Here, genuine issues of material fact exist, for example, as to (1) whether Mr. Rudrude heard Mr. Carr make age-related comments and whether he acted upon those comments; (2) whether Mr. Rudrude unfairly subjected Mr. Murphy to heightened performance standards; (3) whether Mr. Rudrude used the DPA and performance reviews, including the performance review for the 2003 fiscal

15

year, to target Mr. Murphy; (4) whether the audit investigation unfairly targeted Mr. Murphy; and (5) whether the combination of these alleged occurrences created an intolerable working condition for Mr. Murphy.  These questions are for a jury to decide.

Because genuine issues of material fact exist as to the elements of a prima facie case of age discrimination, summary judgment on this claim is inappropriate.  Therefore, the court need not determine whether Kmart has demonstrated legitimate, nondiscriminatory reasons for its actions, whether Mr. Murphy has established pretext, or whether Mr. Murphy has demonstrated direct evidence of discrimination.[23]

**B.      Whether Summary Judgment is Appropriate on Mr. Murphy's State Law Claim of Intentional Infliction of Emotional Distress**

Under South Dakota law, the elements of intentional infliction of emotional distress are: (1) an act by defendant amounting to extreme or outrageous conduct; (2) intent on the part of defendant to cause plaintiff severe emotional distress; (3) defendant's conduct was the cause in-fact of plaintiff's injuries; and (4) plaintiff suffered an extreme disabling emotional response to defendant's conduct.  Reynolds v. Ethicon Endo-Surgery, Inc., 454 F.3d 868, 873 (8th Cir. 2006) (citing Petersen v. Sioux Valley Hosp. Ass'n, 486 N.W.2d 516, 518 (S.D. 1992)).  Under this standard, "the conduct necessary to form

--------

[23]Kmart also challenges whether Mr. Murphy was subject to a hostile work environment because of his age.  (Docket 181 at pp. 16-19).  Nowhere in Mr. Murphy's original or amended complaint does he assert a cause of action or seek damages for hostile work environment.  See generally Dockets 1 & 155.  Because Mr. Murphy did not plead this issue, the court declines to address it.

intentional infliction of emotional distress must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community." Id. (internal quotation marks omitted) (quoting Harris v. Jefferson Partners, L.P., 653 N.W.2d 496, 500 (S.D. 2002), quoting Richardson v. East River Elec. Power Coop., 531 N.W.2d 23, 27 (S.D. 1995)).

The tort of intentional infliction of emotional distress imposes liability on a defendant for reckless conduct as well.  Id. (quoting Petersen, 491 N.W.2d at 468); see also Moysis v. DTG Datanet, 278 F.3d 819, 827 (8th Cir. 2002) ("Although in South Dakota the tort of intentional infliction of emotional distress includes extreme and outrageous conduct, . . . the tort also 'includes reckless conduct resulting in emotional distress.' ") (quoting Richardson, 531 N.W.2d at 27).  "To establish reckless conduct, a plaintiff must show that a defendant 'recklessly acted in a manner which would create an unreasonable risk of harm to him, and that [defendant] knew or had reason to know of facts which would lead a reasonable man to realize that such actions would create the harm that occurred.' "  Moysis, 278 F.3d at 827 (quoting Wangen v. Knudson, 428 N.W.2d 242, 248 (S.D. 1988)).

Termination from employment alone does not give rise to a claim for intentional infliction of emotional distress.  Reynolds, 454 F.3d at 873-74.  Nor do mere "insults, indignities, threats, annoyances, petty oppressions or other trivialties" rise to the level of extreme and outrageous conduct.  Citibank (S.D.), N.A. v. Hauff, 668 N.W.2d 528, 536 (S.D. 2003) (citations omitted).

17

It is the duty of the court to determine whether defendant's conduct is extreme and outrageous.  Richardson, 531 N.W.2d at 27.  However, where reasonable minds may differ, that determination is best made by a jury.  Id. Here, the court finds reasonable minds may disagree as to whether Kmart's alleged conduct was extreme and outrageous.  Genuine issues of material fact exist as to whether Mr. Rudrude unfairly used the DPA and other performance reviews against Mr. Murphy to force his resignation and whether Kmart unfairly targeted Mr. Murphy as the subject of an audit investigation.  If Mr. Murphy succeeds in proving these and other allegations, reasonable minds could differ as to whether such conduct was extreme and outrageous.  The court also bears in mind Mr. Murphy's long history as an employee of Kmart. Mr. Murphy was not a temporary employee, where leaving a job may be a less stressful experience for one not invested in the company.  Rather, Mr. Murphy devoted his career and many years to Kmart.  If he succeeds in proving Kmart constructively discharged him because of his age, a jury may well find such conduct to be extreme and outrageous or, at the very least, reckless.  Further, reasonable minds could differ as to whether Kmart, through Mr. Rudrude, intended to cause Mr. Murphy such emotional distress that he would resign his position.[24]  Accordingly, summary judgment is inappropriate on Mr. Murphy's claim of intentional infliction of emotional distress.

---

[24]Mr. Murphy intends to introduce testimony of Dr. Dewey Ertz that Mr. Murphy has an adjustment disorder with anxiety as a result of allegedly being unfairly targeted, treated, and controlled by Kmart.  (Docket 196 at ¶ 170).  Dr. Ertz would testify that Kmart's actions caused Mr. Murphy to suffer severe emotional distress.  Id. at ¶ 171.  Dr. Ertz would testify that such anxiety is a debilitating condition.  Id. at ¶ 172.

**C.**      **Whether Summary Judgment is Appropriate on Mr. Murphy's State Law Claims of Fraud and Deceit**

Under South Dakota law, the essential elements of fraud and deceit are nearly identical.  Stockmen's Livestock Market, Inc. v. Norwest Bank of Sioux City, 135 F.3d 1236, 1243 (8th Cir. 1998).  The elements of common law fraud are as follows:

> That a representation was made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made; that it was made with intent to deceive and for the purpose of inducing the other party to act upon it; and that he [or she] did in fact rely on it and was induced thereby to act to his [or her] injury or damage.

Id. (citing Dahl v. Sittner, 474 N.W.2d 897, 900 (S.D. 1991)).

Deceit is a statutory cause of action in which "[o]ne who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."  SDCL § 20-10-1.  A "deceit" is either:

(1)      The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

(2)      The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;

(3)      The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or

(4)      A promise made without any intention of performing.

SDCL § 20-10-2.  Both fraud and deceit "require proof of an intentional misrepresentation or concealment of fact on which plaintiffs relied and which

19

caused an injury to them." <u>Brookings Mun. Utlities, Inc. v. Amoco Chemical Co.</u>, 103 F. Supp. 2d 1169, 1177-78 (D.S.D. 2000).

The court finds genuine issues of material fact exist with respect to Mr. Murphy's claims for fraud and deceit.  Whether it was Mr. Rudrude or some other Kmart employee who performed Mr. Murphy's performance review for the 2003 fiscal year is a material question.  If Mr. Rudrude performed the review, he did so before he even met Mr. Murphy–a fact which calls into question the validity of the review.  Whether the poor review was intended to induce resignation and whether it actually induced resignation are genuine issues of material fact for the jury to decide.  Similarly, whether Mr. Rudrude drafted the DPA before or after he visited the Rapid City Kmart store; whether he created the DPA as a fraudulent document; whether he collaborated with Mr. Gonzalez to make the DPA more plausible; whether he deliberately misled Mr. Murphy into believing he would be terminated if he did not improve on the DPA; and whether this alleged misrepresentation was intended to induce resignation or actually induced resignation are genuine issues of material fact that are within the province of a jury.  Additionally, a genuine issue of material fact exists as to whether Kmart manufactured the audit investigation to induce Mr. Murphy to resign.  These questions render summary judgment inappropriate on Mr. Murphy's claims for fraud and deceit.

## CONCLUSION

In accordance with the above discussion, it is hereby

ORDERED that Kmart's motion for summary judgment (Docket 180) is denied in its entirety.

Dated March 14, 2011.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE